# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

           Plaintiff,

vs.                          Case No. 3:21-CR-87-jdp

NOAH EISELE,

           Defendant.

## SENTENCING MEMORANDUM

What is a year worth?

$44,258?[1]  $94,936.71?[2]  More?

What about fifteen years? Is it possible to put a price on such a thing? What would you pay to have fifteen years-worth of birthdays, sunsets, full moons, and the occasional caught-in-the-rain frolic? Fifteen years of children's runny noses and skinned knees that transform into pimply faces and ripped jeans? Fifteen years of punched time-clocks, morning cups of coffee, and laying down at night next to someone you love? What is all that worth?

It is a rhetorical question...but not really. Because it is the question at the heart of the task before this Court on May 25. What is a year of Noah Eisele's life worth? What about fifteen years? More? In order to dole out punishment in month and year sized

---

[1] *See* PSR ¶ 124 (annual cost of imprisonment).
[2] This number represents FEMA's 2020 value of statistical person ($7,500,000) divided by the average life expectancy of a US citizen (79 years). *See* FEMA Benefit-Cost Analysis (BCA) Toolkit 6.0 Release, available at https://www.fema.gov/sites/default/files/2020-08/fema_bca_toolkit_release-notes-july-2020.pdf

servings we need to know what those value of those portions really are. How can we, as a society, sanction a punishment for a crime without first contemplating what that that punishment is worth?

This is a question I am certain that the Court has wrestled with before. But I think (hope) that it bears repeating, re-asking, and if only for a moment, reconsidering. Just as it is easier to spend someone else's money, it is easier to undervalue someone else's time. So…what is a year worth?

The United States Sentencing Guidelines were designed to provide some guidance on this question. But in this case, they fail. Miserably. Noah Eisele's advisory sentencing guideline is 360 months. It is so low only because, mercifully, it is constrained by the maximum penalty for his crime. The Advisory Guidelines *wanted* to send him to prison for life. *See* PSR ¶ 113. But neither the Guidelines' aspirational nor actual recommended sentence bears any relation to what an appropriate sentence in this case would be. Noah engaged in some truly reprehensible conduct. But he is not a monster. Instead, he is someone who was a dedicated father, community member, and friend. He is remorseful, self-reflective, and committed to treatment. He has aspirations—to help others who struggle with the same shameful desires—that stretch beyond his term of confinement. He deserves a significant punishment. But that punishment should be reflective rather than reflexive. Fifteen years is a serious punishment and is sufficient to address the sentencing factors in this case.

I. **Circumstances of the Offense.**

Noah's decent into the bowels of the Internet was no mistake; it was a long time coming. He has compulsive sexual behavior disorder, and has struggled with this

addiction for more than half his life. *See* Psychosexual Evaluation, *Dr. Lakshmi Subramanian,* (7/20/21), p. 8 (Dkt. # 26).  Struggled is the correct word.  He sought help from religious leaders and fellow church members, disclosed his proclivity for pornography to his wife, and attempted to use "accountability" software to curb his pornography use.  To be clear, this addiction was not specific to child pornography, it was an all-encompassing addiction that included child pornography.

Noah's attempts to curtail his pornography usage were effective at times.  But, as is the case with most addictions, tools that managed the symptoms rather than addressed the root cause were ultimately unsuccessful.  After his arrest, once Noah began to participate in sexual addiction therapy, he realized that his pornography use was a coping or calming mechanism that he has developed to deal with his anxiety.  For years he believed he just had a "strong sex drive," but came to understand that he had trained himself to deal with stress and anxiety through viewing pornography.

But back in the spring of 2020, he had yet to gain this insight.  Stress and anxiety mounted.  As a stay-at-home father for three boys, Noah was already relatively isolated.  When COVID hit that isolation became much more stifling.  His wife, a nurse and front-line worker, brought home the trauma of confronting a pandemic head-on.  It was a difficult time for everyone, and the Eisele household was no different.  But unlike others who had learned to cope with this stress in healthy (or at least legal) ways. Noah retreated to his most shameful but trusted refuge, pornography.

He began staying up late and sneaking around on the computer, or using an old cellphone that could avoid the accountability software he and his wife had installed. After reading a story about someone using a fake Facebook profile to solicit naked images from

3

others, a deviant curiosity pushed him to try himself. He wondered whether that would really work. It did. Immediately. At first, Noah was surprised. But once he realized how easy it was to find girls who would interact with him and send him naked photos, he began to consume it like a drug. He wanted more and he wanted it harder. It became a compulsion.

Over the course of the year, there were a number of times when he tried, and did, stop. He closed his Facebook profile on multiple occasions. But because Facebook does not actually delete a profile for 30 days after it is cancelled, he was never able to fully step away.[3] In the words of Lin Manuel-Miranda's Alexander Hamilton ,"the last time became a pastime." His vice became a habit, and he continued to engage in his compulsive behavior until his Facebook account was flagged and shut down.

There are two obvious aggravating factors here. First, Noah interacted with a large the number of teenage girls. He estimated in his interview with law enforcement that close to fifty sent him naked images.[4] Second, some of his chat-interactions went beyond the garden variety "I'll show you mine if you show me yours" sexting, into bdsm-themed exchanges.

To the first point, the scope of his conduct is clearly aggravating. But given that this was a purely virtual crime, it is also not that surprising. The Internet is, at its core, a tool to facilitate connection. The ease with which it allows mass interactions, particularly through social media algorithms, enables one to maximize contacts with minimum effort. This does not really minimize the harm that Noah caused, but it does blunt—to a limited

---

[3] *See* https://www.facebook.com/help/android-app/224562897555674 (Facebook cancellation policy, noting that an account can be recovered for 30 days after cancellation)
[4] This estimate may overrepresent the actual number. There are 13 total identified victims. *See* PSR ¶ 28.

4

degree—the moral culpability associated with his actions. There was, essentially, a easily accessible economy of scale that was literally at his fingertips.

As it pertains to the harm caused, it is worth noting that because of the nature of this offense, it is likely that many of the victims are, and will remain, unaware that "Brandon Schuma" was anyone other than a teenage boy who they elected to voluntarily share nude images with. While this does little to minimize his moral culpability, it does mitigate—to a degree—the harm caused.

Regarding the content of his communications, there is little mitigation. Engaging in BDSM-themed chat is fine amongst consenting adults, but there is simply no argument to be made that it is anything but aggravating when done with a teenager. While these aggravating factors are present, it is also worth noting what behaviors are not.

First, at no point did Noah attempt to meet with, or even discuss meeting with, any of the teenagers that he contacted. However unconcerned he was with boundaries within the digital realm, one boundary he showed no interest or intention of crossing was attempting to move these online conversations into real-world interactions. Second, unlike so many production cases, he did not use or abuse a position of trust in order to gain access to any of these victims. He used deception—posing as a teenage boy—to persuade these girls to interact with him, but undermining the trust that a teenager places in a random social media profile caries far less harm than does eroding the trust that a child places in a coach, teacher or mentor. Finally, Noah never engaged in threats or coercion to try and obtain naked photos from these victims.[5] This is particularly odious

---

[5] One victim (MV4) claims that he did threaten her. *See* PSR ¶ 26. Simply put, this never happened. As documented in the chat-logs between Noah and MV4, no such threats were made. Nor would it make sense, as she alleged in her interview, that he erased the messages immediately after sending them. Were he erasing messages, he surely would have chosen to erase other, more inculpatory messages from their

behavior that would serve to drastically increase the fear, anxiety, and shame suffered by a victim. His lack of such conduct serves to distinguish him from other offenders who did force their victims to endure the weight of blackmail on top of sexual exploitation.

## II. HISTORY AND CHARACTERISTICS.

"Was Noah living a double life? Yes and no. He was living a life of dissonance." *See* Ex. F (Letter of support from Janine Hegle (Mother-in-law), p.2).

In sexual deviance cases—particularly those involving children—it is be enticing to view the offender's criminal conduct as their "true" self. The logical progression of this flawed premise is to then discard any positive or pro-social conduct that an offender may have engaged in as sham or cover, a ruse spun to allow them latitude to offend. This model might fit in some instances, but it does not apply here.

Instead, Noah's thirty six years of life shows that he is a complicated and flawed man who is not easily categorized as "good" or "bad." He has been a beloved and dedicated father, active and contributing member of his faith community, and has shown remarkable effort and candor while trying to address his problems through therapy. But, he has done all of this while struggling with a secret and damning burden that led to the exploitation of minors. There is no evidence that one of these parts of Noah is the true, or authentic version. Rather, the two are in conflict, creating discomfort for us as observers of his life, and even greater conflict for Noah himself. He was living a life of dissonance.

---

chat-log. Further, Facebook provides responses to law enforcement subpoenas that show deleted messages, and the responsive documents show no such messages. Finally, there were no instances where MV4 denied or was equivocal about any of Noah's requests. Thus, even if he had been willing to threaten or extort her—which he was not—there was never an occasion that would have called for him to do so. This is confirmed in the PSR itself. *See id.* ("There is no additional evidence to show the defendant made any threats to MV4 or deleted any messages sent to her.").

His negative actions are well documented.  But they should not wash over his many good deeds and characteristics.  First, Noah is unequivocally a loving, caring and committed father to his three boys.  Prior to having children, Noah worked full-time as a mechanic.  However, he left the workforce after the birth of he and his wife's first child so that he could be a stay-at-home parent, and he dedicated his life to his boys.  By all accounts, he was a wonderful father.  And despite his pre-trial incarceration he has maintained his relationship with his boys through daily video-visits.

Beyond his own family, Noah was a positive and contributing member of his church community.  As is demonstrated by his statements throughout the Pre-Sentence Report, and as will be demonstrated in his allocution, he is a man of strong faith.  This faith has been coupled with positive actions to assist the lives of many that he has come into contact with.  His spirit and impact are best told through the letters of support submitted on his behalf.  These letters speak of someone who volunteers for all manner of church service, who mentors the young and comforts the old.  They discuss the little things he did to benefit others, whether it was lending someone a vehicle while their car was being repaired, or ensuring that an extension cord was laid-out and waiting every Sunday for a fellow parishioner who needed a heating pad to address a chronic health condition during service.  A common theme throughout these letters is how Noah could raise the spirits and esteem of all he spoke to because of his ablity to listen, and make others feel valued.  These are all positive impacts that live on despite his crimes.

Of course, the other side of this argument is that his crimes are not undone by his many good deeds.  These crimes happened and cannot nor should not be swept under the proverbial rug when assessing his character.  But some of the best insight into Noah's

character can be gleaned from how he struggled with his sexual addiction before his arrest, and how he has tackled it head on after.

Prior to his arrest Noah struggled for many years with his pornography addiction. He sought out men's groups through his church to discuss it, was open with his wife about his struggles, and tried using accountability software that would provide his wife updates about his online activity. *See* PSR ¶ 97. He even told his mother-in-law that he struggled with pornography use, a particularly open and honest disclosure. *See* Ex. F (Letter of support from Janine Hegle (Mother-in-law), p.2). Nevertheless, these attempts at disclosure and accountability simply were not enough to overcome the pull of addiction. But the fact that he tried, that he made so many efforts at controlling this albatross, should matter.

Also relevant to an assessment of his character has been his actions after his arrest. From the moment he was arrested he has taken full and complete responsibility for his actions. Unlike so many, he made no attempts to minimize his behavior or shift blame to his victims. Instead, he provided officers with a complete confession. *See* PSR ¶ 22. Moreover, his acceptance of responsibility has not been limited to law enforcement. Time and again the letters of support speak to his open and honest acknowledgement of his wrongdoing, and his contrition for them. As Noah will explain, in many ways he needed this full, laid-bare confession, in order to begin the processes of actually addressing his addiction. It was the only way to excise the dissonance he had been living with for so long.

Soon after his arrest, he threw himself head-first into treatment. He met regularly with Pastor Jason Eddy, who works with other pastors who themselves struggle with

8

sexual misconduct. He also began attending weekly sessions with therapist Kevin Randall, through the Center for Christian Counselling. The latter, as the name suggests, is a faith-based addiction treatment program that embraces a neurocognitive approach to addiction treatment. As Noah will explain in his allocution, this helped him to understand the neurological connections that he had made at an early age between the significant, often crippling anxiety he struggled with as a child, and his use of pornography. His efforts extended beyond just his therapy sessions, He read anything he could get his hands on to try and better understand—and ultimately manage—his addiction. *See* Ex. A (Noah's reading list). Noah is under no delusion that he has "solved" his problems in the brief time he was out of custody and participating in treatment. But his progress has been notable. *See* Psychosexual Evaluation Update, *Subramanian, Lakshmi,* May 19, 2022, Page 3, (Dkt. # 26). This motivation and effort evidences a true desire to change, and provides a final observation of Noah's character.

### III. AN APPROPRIATE SENTENCE.

At every sentencing the Court has the unenviable task of trying to reduce to a single number the balance of complex and often competing factors. Paramount of those factors is the protection of the public, as the Court is called on first and foremost to ensure that the community is safe. Thus, put in sharper focus, the question before the Court is, whether a sentence of more than fifteen years is necessary to ensure the safety of the community. The answer is no.

As an initial matter, Noah has no previous criminal history, and no history of any anti-social behavior outside of the sexual deviance at the center of this case. Further, it notable that Noah never been convicted, or even accused of, any inappropriate hands-on

activity. As documented in the letters of support, there is no indication that Noah had any trouble recognizing or conforming to appropriate boundaries, sexual or otherwise, in his numerous interpersonal relationships. Noah obviously crossed many boundaries within the online realm, but that behavior has never moved into his actual in-person interactions with others. This is relevant to a dangerousness analysis because monitoring online activity is a far easier and more reliable within the community than is monitoring one's day-to-day interactions with others.

      The lack of danger he poses to the community is confirmed by Dr. Subramanian's psychosexual evaluation and supplement. Prior to the identification of the victims in this case, the CPORT sexual recidivism tool was the only validated tool to assess Noah's risk of recidivating. That tool indicated that Noah had a 3-7% chance of committing another child pornography offense, and a 2-4% chance of committing a contact offense. *See* Psychosexual Evaluation, (7/20/21), p. 12. After the identification of the victims and subsequent federal indictment, two additional risk assessment tools became validated for assessing Noah's risk. Dr. Subramanian then used the Static-99R, an actuarial tool that measures static risk factors, and Stable 2007 (Hanson and Harris, 2007; Hanson et al., 2007) assessment, which measures a series of dynamic risk factors, to determine a risk profile for Noah. Based on a combination of these two assessments, Dr. Subramanian determined that Noah was in the "average" recidivism risk category, and has an 8% risk of recidivism over five years. *See* Psychosexual Evaluation Update, (5/19/22), p.5. This is well below the overall five-year recidivism rate of 43.1% for all federal prisoners,[6] as

---

[6] *See* United States Sentencing Commission, Recidivism of Federal Offenders Released in 2010, p.21 (2021)*, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210930_Recidivism.pdf*

well as the 30% recidivism rate specific to child pornography offenders.[7] Further, a sentence at the fifteen year mandatory minimum will see Noah released just before his fiftieth birthday. That is significant because it marks a point where recidivism (reconviction) rates drop precipitously, decreasing from 30.3% for someone released at age 40, to 15.9% for those released at age 50.[8] Taken together, Noah generally has a low risk to recidivate, appears to have a strong support network and motivation to change, and will not be released until he reaches an age where he is less likely to engage in criminal behavior. This combination of factors demonstrates that a sentence above the mandatory minimum is not necessary for the public's safety.

Looking beyond public safety, the Court must also ensure that it maintains public confidence in our criminal just system. To do so the Court's sentence should reflect the seriousness of the offense and promote respect for the law. All too often these factors are used solely to justify long prison sentences. But it is important to consider that this calculation works both ways. Noah's friends and supporters—of whom there are many—will be as, or more invested in this sentence than anyone else. A sentence that strikes the appropriate balance of accountability and mercy, particularly for a first-time offender, can be a more powerful tool in promoting respect for the law than can a harsh sentence anchored in the instinct to punish.

As for the need to respect the seriousness of the offense, there is no debate that Noah's offense is serious. But data from other similar, or even more serious offenses,

---

[7] *See* United States Sentencing Commission, Federal Child Pornography Offenses, p.299 (2012), *available at* https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/sex-offense-topics/201212-federal-child-pornography-offenses/Full_Report_to_Congress.pdf

[8] *See* United States Sentencing Commission, The Effects of Aging on Recidivism Among Federal Offenders, p.23, Fig.14, (2017), *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf

can help to gauge what is a proportionally serious response. The Wisconsin equivalent to the federal production of child pornography statute is found at Wis. Stat. § 948.05. Offenders convicted under this statute receive a sentence of less than ten years in prison 67% of the time. *See* Ex. B.[9] Only 6% of those convicted under Wisconsin's production of child pornography statute received a sentence of more than fifteen years. *See id.*[10] The same pattern holds true for actual hands-on child sexual assault offenses. Seventy-eight percent of offenders convicted under Wis. Stat. § 948.02(2), criminalizing sexual assault of a child under that age of sixteen,[11] receive a sentence of less than ten years in prison. *See* Ex. C.[12] Only 6% of those convicted under § 948.02(2) receive a sentence of more than fifteen years. *See id.* Finally, prior to the indictment in this case, the State of Wisconsin was prepared to resolve Noah's state case for a three-year-prison sentence. *See* Ex. D. In that case he was charged only with the possession of child pornography, rather than its production, but the State was aware of the full scope of his conduct when they made this offer. *See* Ex. E.

In sum, 94% of offenders in Wisconsin state court receive prison sentences of fifteen years or less for similarly serious offenses. The State of Wisconsin, with full knowledge of Mr. Eisele's conduct, believed that a sentence of three-years was an

---

[9] This data, and all of the subsequently referenced Wisconsin court data, is from cases beginning on or after January 1, 2010.

[10] This statistical analysis is imperfect. It reflects the sentences imposed for each count, rather than each case. This thereby fails to account for sentences that are imposed consecutively, or concurrently to a longer sentence that may be imposed for an actual sexual assault, It also counts multiple counts for concurrently imposed sentences above fifteen years in single cases. *See, e.g.,* State v. Robert Huber, 2013CF5047. While not perfect, there are errors that will skew the data in both directions. While the conclusion that only 6% of production cases in the State have sentences over fifteen years may require a margin of error, it is still a useful data point.

[11] Other subsections of this statute criminalize sexual assault of children twelve and under and are not included in this analysis.

[12] Exhibit C shows that 461 counts where a sentence of ten years or more. Of those 461 cases only 119 of them included sentences that were longer than fifteen years. This totals 5.7% of the overall number of cases. I am unable to file the raw data because the document is too large. But I can provide it to the Court or the Government upon request.

adequate punishment to address this offense.  Noah's actions were serious, reprehensible, and far-reaching.  But the same adjectives can be used to describe a prison sentence of fifteen years.  When considering how other jurisdictions view this and other similar crimes, a sentence of fifteen years is sufficient to acknowledge the admittedly serious nature of this offense.

If sentenced to fifteen years, Noah will likely walk out of prison at some point in 2034.[13]  He will be forty-eight.  His children, the primary focus of his life for the past six years, will be eighteen, sixteen, and fourteen respectively.  He will have missed years of their milestones, failures and accomplishments.  He will have missed his youngest's first sentence, and his oldest's high school graduation.  Speaking personally, as a father of two similarly aged children, thinking about the pain of missing all these moments is overwhelming.  Noah, a stay-at-home father who cared daily for his three children until his arrest, no doubt feels the same.

We often think of the punishment associated with prison as the deprivation of liberty.  The more vindictive in our society think of it as the imposition of harsh or inhumane conditions.  It certainly is the former, and it can be the latter.  But it is more.  The real punishment is the loss of a person's most valuable commodity, time.  The next fifteen years of Noah's life would have been filled with moments—good and bad—that he could cherish.  But he threw them away and there is nothing he can do to get them back.  That is what makes this punishment so damning.

With that in mind, perhaps the best way to frame the ultimate question facing the Court is this:  Is there something accomplished by sentencing Noah to more time than fifteen years?  Does sixteen, or eighteen, or twenty years of imprisonment provide

---

[13] This assumes credit for good-time.

meaningfully more security to the public? Would three, or five, or ten additional years of punishment make this sentence anymore "just?" Is there anyone out there who will be deterred from committing similar offenses by a twenty-year sentence, but who would not be by a sentence of fifteen years? I humbly suggest that the answer to all of these questions is "no."

I do not know what a year is worth. But whatever it may be, fifteen years is worth more than enough to pay for Noah Eisele's crimes. His actions were revolting, but he is not unredeemable. By any honest assessment fifteen years in prison is a kick to the teeth. It satisfies the need for a harsh penalty. But it also allows a modicum of hope. Noah has plans to start a ministry while incarcerated, to address the issues of sexual addiction that have plagued him. Given his progress and the insight he's gained in a relatively short period of time, there is reason to believe that he can be a real asset to others facing these struggles. Perhaps he can help others to address their problems before they reach the point that Noah did. Here, a fifteen year sentence strikes the appropriate balance between the sentencing factors, between punishment and mercy, between accountability and hope. It is a just sentence. Whatever it does not accomplish can't be purchased with another year.

### IV.     CONCLUSION

For the reasons stated herein, the Defendant, Noah Eisele, respectfully requests that the Court sentence him to 15 years in prison.

Dated at Madison, Wisconsin, May 23, 2022

                                                     Respectfully submitted,

                                                     Noah Eisele, Defendant
                                                     Nathan T. Otis

Nicholson Goetz & Otis, S.C.

BY: _____/s/_____
NATHAN T. OTIS

15